***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Ledford. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford with minor modifications.
 *********** MOTION TO DISMISS
Defendants' motion to dismiss plaintiff's claim for failure to state the grounds of his appeal with particularity is hereby DENIED.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The date of the injury, which is the subject of this claim, is October 19, 2000.
3. On such date, an employee-employer relationship existed between plaintiff-employee and defendant-employer.
4. Defendant-employer is insured by Citizens Hanover Insurance Company.
5. Plaintiff's average weekly wage was $400.00, producing a compensation rate of $266.80.
6. Plaintiff-employee sustained an injury on or about October 19, 2000, with the exact date to be determined by the Industrial Commission.
7. The injury arose out of and in the course of employment and is compensable.
8. The parties have stipulated into evidence the following documents:
 a. All Industrial Commission Forms.
 b. Plaintiff's medical records.
 c. The Parties' responses to discovery requests.
 d. Vocational rehabilitation documents.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 46 years of age. He completed eleven and one-half years of school and earned his GED in 1976. *Page 3 
Plaintiff's vocational background is in carpentry, with experience in tile and marble installation. He began working for the employer as a carpenter on or about October 18, 2000.
2. On or about October 19, 2000, plaintiff was on a scaffold during the construction of a house in Oak Island, North Carolina, when he lost his balance and fell approximately six feet to the ground, landing on his feet in the sand, and injuring his left heel.
3. Plaintiff was evaluated at H. Arthur Memorial Hospital, where he was diagnosed with a left nondisplaced calcaneus fracture. Plaintiff also reported symptoms of a lumbar strain involving the left sacroiliac joint. The fracture was cast. Plaintiff testified that he has left leg pain, pain in his left knee and pain in his left heel, which he relates to the calcaneal fracture.
4. Plaintiff came under the care of Dr. John Azzato of Orthopaedic Specialists, P.A., in Southport, North Carolina, who monitored plaintiff's progress. Dr. Azzato took him out of work, indicating that he might be able to return to light duty work, sitting all the time as of December 6, 2000.
5. Plaintiff is prone to an addictive personality, with alcohol and substance abuse, as shown by his medical and social history. At plaintiff's November 7, 2000 visit to Dr. Azzato, plaintiff reported to Dr. Azzato that the Vicodin prescribed had not been taking care of his pain, but he had gotten some OxyContin from a friend, which was helping him. Dr. Azzato refilled plaintiff's Vicodin, but denied his request for OxyContin.
6. X-ray films taken on November 15, 2000 revealed good healing of the heel fracture, with progressive fusion. Following removal of the cast, plaintiff participated in range of motion exercises. At plaintiff's visit on December 13, 2000, Dr. Azzato found that his swelling had decreased, and advised plaintiff to advance to walking without his crutches over the *Page 4 
next month. Dr. Azzato also noted that plaintiff could advance to a sedentary job position, not just "sitting only."
7. Although the fracture was healing well, plaintiff continued to complain to Dr. Azzato of heal pain. At his January 10, 2001 visit, plaintiff reported that his ankle was slowly getting better. Dr. Azzato noted a "minimally displaced calcaneal fracture, healed." Dr. Azzato continued plaintiff on light duty work restrictions, with no prolonged standing or walking, and no climbing stairs, ladders or poles.
8. Plaintiff was seen by Toni Harris, M.D. on January 27, 2001 "referred for evaluation of neck, foot and leg pain." At that time, plaintiff reported to Dr. Harris that he had lost his driver's license for drunk driving about a year and a half ago. Plaintiff told Dr. Harris that Dr. Azzato believed his fracture was healed sufficiently that he should not be using his crutch or boot, but he continued to do so. Dr. Harris also "strongly advised" plaintiff to discontinue using his crutch and boot as instructed by Dr. Azzato, and to "begin active participation in his own rehabilitation." Physical therapy and a trial TENS unit were prescribed. Dr. Harris concurred with Dr. Azzato that plaintiff could return to light duty sedentary work.
9. At his February 7, 2001 visit to Dr. Azzato, plaintiff complained of left sciatic nerve pain and both shoulders "locking up." On exam, Dr. Azzato found minimal tenderness and swelling of the left foot and ankle with good ankle motion and excellent external eversion, and fifty percent restriction of inversion. He recommended that plaintiff be fitted with special work boots at the Redwing Shoe store.
10. At his March 8, 2001 visit, plaintiff reported to Dr. Azzato that "my heel is doing fine" but at his next visit on April 9, plaintiff complained that his knee was hurting. X-rays taken *Page 5 
on April 9, 2001 revealed complete healing of plaintiff's calcaneal fracture with anatomical alignment of the subtalar joint.
11. At his April 9, 2001 visit, Dr. Azzato concluded that plaintiff had reached maximum medical improvement and assigned a ten percent permanent impairment rating (10% PPD) to his left lower extremity related to his calcaneal fracture. Plaintiff was to continue use of his TENS unit. Although plaintiff complained of knee pain, Dr. Azzato did not believe he had internal knee derangement.
12. Plaintiff was evaluated by Barbara M. McDonald, M.D., of Coastal Rehabilitation on April 27, 2001, on the referral of Victoria Sanchez and Kathy Pressley of Genex. Dr. McDonald did not have all of plaintiff's prior records and noted at that time that plaintiff was a "poor historian." Plaintiff complained of left groin popping, left knee pain and left foot cramping. Dr. McDonald evaluated plaintiff with a good range of motion, except for the subtalar joint, which she assessed as "25-50% impaired." Dr. McDonald recommended that plaintiff participate in a therapy program, as opposed to work hardening, to strengthen his left lower extremity, and also determined a Functional Capacity Evaluation (FCE) would be appropriate. Dr. McDonald continued plaintiff's pain medicines and prescribed custom orthotics. She agreed with Dr. Azzato's assessment of MMI with a 10% PPD of the left leg.
13. Plaintiff continued in follow-up with Dr. McDonald and continued to complain of pain. In her notes of June 4, 2001, Dr. McDonald noted a "heightened pain response" related to the left calcaneal fracture, and her belief that plaintiff "has an exacerbation, secondary to his history of alcohol abuse." She continued him on physical therapy and to be out of work until his return visit. She again mentioned a possible FCE, as plaintiff's physical examination did not match his symptoms. *Page 6 
14. Dr. McDonald observed plaintiff ambulating at Coastal Rehabilitation Hospital on August 28, 2001, when plaintiff was unaware she was observing him. In a letter of September 10, 2001, Dr. McDonald reported that she noted no gait dysfunction, a significant change from his examination in her office. Her observations were also supported by those of Laura Schwergl, a physical therapist, who followed plaintiff for more than 200 feet on uneven surfaces and did not see any gait dysfunction. At plaintiff's office visit of September 17, 2001, Dr. McDonald told him about her observations and that she believed he was magnifying his symptoms. She then released him to find another physician.
15. Plaintiff's claim was accepted as compensable and a Form 60 dated May 21, 2001 was filed. The Form 60 reflected an average weekly wage of $320, and a compensation rate of $213.34, with payment of temporary total disability compensation beginning October 20, 2000.
16. On November 6, 2002, counsel for both parties entered a Stipulation that plaintiff's correct average weekly wage should be $400, with a compensation rate of $266.80. Per the Stipulation, plaintiff was to be paid a lump sum of $5,562.94 due to the past underpayment, and continuing temporary total disability compensation at the rate of $266.80 per week, until plaintiff returned to work or until further order of the Commission.
17. Plaintiff relocated to Georgia, in the community of Winder, Georgia, which is a small community located north of Atlanta. Due to plaintiff's move to Georgia, his treatment was transferred to the Atlanta Center for Athletes, where he was treated by John Foster, M.D. During 2001 and 2002, he was also under the care of family physician Dr. Richard Schlossberg of Auburn Primary Care.
18. Dr. Richard Schlossberg testified in this matter. Dr. Schlossberg saw plaintiff about eight times, treating him for various complaints, including his complaints of heel and back *Page 7 
pain and ringing in his ears. They never discussed any complaints of depression. When Dr. Schlossberg saw plaintiff on September 26, 2002, plaintiff smelled like beer. When Dr. Schlossberg confronted him about it, plaintiff said that he was drinking a six-pack of beer a day. Dr. Schlossberg wrote plaintiff a prescription for Antabuse, which would make him violently ill if he drank alcohol while taking this medication. However, per Dr. Schlossberg's testimony, plaintiff never renewed this medication. It is Dr. Schlossberg's opinion that plaintiff suffers from alcoholism.
19. On or about February 15, 2002, Dr. John Foster first examined plaintiff. At that examination, plaintiff complained of back, left knee and left foot pain, as well as neck pain. Dr. Foster found mild pain in his truck, shoulders, and left knee, but did not find any limitation in his ranges of motion, and diagnosed a cervical strain, thoracic strain, lumbar strain and status post calcaneus fracture. Dr. Foster ordered an EMG study to rule out radiculopathy in the left leg.
20. On February 22, 2002, it was determined that the EMG was normal. Considering the normal EMG results, Dr. Foster sent plaintiff for a Functional Capacity Evaluation, noting that plaintiff would most likely be assessed at maximum medical improvement.
21. After the FCE, Dr. Foster found that plaintiff had reached maximum medical improvement. At plaintiff's office visit on May 22, 2002, Dr. Foster assessed him, based on the AMA Guidelines, with a permanent partial impairment rating of 2% whole person for the cervical spine, 3% whole person for the lumbar spine, and 3% to the left lower extremity for the left calcaneal fracture. He placed plaintiff on a permanent 40-pound lifting restriction.
22. Subsequent to the hearing in this matter, plaintiff was ordered by the Deputy Commissioner to return to Dr. Foster for evaluation. Dr. Foster examined plaintiff on August 18, 2005. At that time, Dr. Foster also reviewed a lumbar MRI of October 28, 2002, which results *Page 8 
were normal. As a result of that examination, Dr. Foster found that plaintiff's condition had not changed since his last visit in May 2002. Dr. Foster maintained his prior findings of impairment and placed no additional restrictions on plaintiff outside of the 40-pound lifting restriction.
23. As ordered by the Deputy Commissioner, an independent medical examination was conducted on plaintiff to ascertain his psychological and emotional condition, due to the plaintiff's reports of depression, alcohol abuse and a possible suicide threat. Plaintiff was interviewed and examined on September 2, 2005, by Michael C. Hilton, M.D., a psychiatrist practicing in Atlanta, Georgia. Dr. Hilton also administered the Minnesota Multiphasic Personality Inventory-two, commonly referred to as MMPI-II. 24. Dr. Hilton's psychological testing on plaintiff revealed an individual with complaints of excessive pain and somatic problems. Plaintiff's testing also revealed that plaintiff reacts to even minor stress with vague physical complaints, and may at times attempt to dominate relationships through physical complaints, and that plaintiff is "chronically maladjusted."
25. Dr. Hilton diagnosed plaintiff with a personality disorder, with somatoform and passive aggressive characteristics. As Dr. Hilton testified, an individual with a somatoform disorder tends to convert emotional stress into physical complaints. Per Dr. Hilton, plaintiff's personality disorder is not related to his work injury by accident. It was neither caused by nor aggravated by his work injury.
26. Dr. Hilton further diagnosed plaintiff with alcohol abuse under Axis I, with extremely high scores on the addiction proneness indicators. Plaintiff admitted that he tends to get drunk about four times a month and in August 2005, had participated in a detoxification *Page 9 
program in Augusta, which was unsuccessful. Although plaintiff is suffering from alcoholism, per Dr. Hilton's assessment, his alcoholism is not related to his work injury.
27. Plaintiff did not complain of depression and Dr. Hilton found no evidence of depression or anxiety in his examination or testing. Dr. Hilton concluded, and it is so found, that plaintiff has no depression or other psychiatric problems attributable to his work injury.
28. Due to his alcoholism, plaintiff has previously been convicted of at least six DUI's (Driving Under the Influence). Due to his DUI convictions, plaintiff does not currently have a valid driver's license.
29. Plaintiff was directed to vocational rehabilitation in early 2005. His case manager, David M. Stewart of Rehab Services, LLC, testified at the hearing before the Deputy Commissioner. Per Mr. Stewart, the lack of a driver's license is a problem, and plaintiff still has two "outstanding" DUI charges out-of-state. However, Mr. Stewart seemed to think that could be dealt with, although he did not specify a plan other than plaintiff actually securing a driver's license. Per Mr. Stewart's testimony, and considering the testimony and records of the treating physicians, plaintiff's main barrier to returning to employment is his ongoing alcoholism, and not his physical impairment from his accident.
30. Considering the testimony of the treating physicians, plaintiff had reached maximum physical improvement of his heel injury by April 2001, when he was released to sedentary employment by his treating physician, Dr. Azzato. Plaintiff's condition was the same when he was examined by Dr. Foster in May 2002, and his condition has not changed since that time. Plaintiff will need ongoing non-narcotic pain medications, and custom work boots with orthotics, as may be ordered by his treating physician. As assessed by Dr. Azzato and Dr. *Page 10 
McDonald, plaintiff has sustained a ten percent permanent impairment to his left lower extremity due to his left heel fracture.
31. Plaintiff has a permanent 40-pound lifting restriction, as per the testimony of Dr. Foster, the physician who examined him most recently. Per Dr. Foster's testimony, plaintiff has no other physical limitations. As Dr. Foster has stated that an additional FCE is not necessary, no additional physical testing is necessary or ordered at this time.
32. Plaintiff has not attempted to return to work. He has been limited in his vocational efforts primarily by his chronic alcoholism. The evidence fails to establish that plaintiff's alcoholism is causally connected to his injury by accident. His alcohol abuse was neither caused by nor exacerbated by his work injury. Plaintiff's chronic alcohol abuse had begun long before his accident.
33. Plaintiff's personality disorder, with somatoform characteristics, is not causally related to his injury by accident. The medical evidence and testimony from Dr. Hilton shows that plaintiff's alcoholism and personality disorders are pre-existing and have not changed since the work accident. The Full Commission finds as fact that plaintiff has not suffered a change in condition in his alcoholism or his personality disorder. Defendants should not be responsible for any further medical treatment or psychological treatment related to these conditions.
34. Plaintiff's inability to return to employment is related to his past and present alcohol abuse, which is unrelated to the accident of October 18, 2000. Plaintiff has not cooperated with vocational efforts in that he continues to abuse alcohol and has not successfully dealt with this addiction. Plaintiff's alcoholism and related lack of a driver's license, and not his lifting restriction, is the main barrier to his ability to secure employment.
 *********** *Page 11 
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury by accident arising out of and in the course of his employment with defendant-employer when he fell off a scaffold on or about October 19, 2000, resulting in a fracture to his left calcaneus and back injury. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has reached maximum medical improvement from his left calcaneus fracture with a ten percent permanent impairment to his left lower extremity. Plaintiff is entitled to receive permanent partial disability compensation for the left calcaneal fracture, based upon the rating of ten percent to his left leg. N.C. Gen. Stat. § 97-31(15).
3. As plaintiff has failed to prove that his admittedly compensable fall of October 19, 2000 caused or contributed to his alcoholism or other psychological condition, any claim for treatment for such conditions must be denied pursuant to N.C. Gen. Stat. § 97-25; Click v.Pilot Freight Carriers, Inc., 300 N.C. 164, 265 S.E.2d 389 (1980).
4. Plaintiff has failed to prove that he has suffered a change in his physical condition since reaching maximum medical improvement. N.C. Gen. Stat. § 97-47.
5. Plaintiff's claim was accepted as compensable on a Form 60 and plaintiff is not entitled to a presumption of continuing disability. As found as fact herein, plaintiff's current inability to earn wages is not related to his compensable injury. Therefore, plaintiff is not entitled to further disability benefits. N.C. Gen. Stat. § 97-29; See Terasaka v.AT T, 174 N.C. App. 735 (2005), Affirmed per curiam, DiscretionaryReview Improvidently Allowed, ___ N.C. ___ *Page 12 
(10/6/06), citing Russell v. Lowes Products Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993).
6. Plaintiff is not entitled to attorney fees or other penalties or fees as defendants have reasonably defended this matter. N.C. Gen. Stat. § 97-88.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants shall pay all medical expenses incurred by plaintiff for reasonably necessary medical treatment. Defendants shall continue to provide plaintiff with orthotics, work boots, and non-narcotic pain medicine as may be prescribed by Plaintiff's authorized treating physician.
2. Defendants shall pay plaintiff at the rate of $266.80 per week for twenty weeks as compensation for his ten percent permanent impairment to his left leg.
3. A reasonable attorney's fee of twenty-five percent of the amount due plaintiff is approved for plaintiff's counsel and shall be deducted from amount owed plaintiff and paid directly to his counsel.
4. Any claim by plaintiff for treatment for his alleged psychological problems and alcoholism is denied, as the same are not related to his injury by accident.
5. Defendants may terminate payment of temporary total disability benefits to plaintiff, effective immediately.
6. Defendants shall pay the costs, including the following expert witness fees: $325 to Dr. Richard Schlossberg, $500 to Dr. John Foster, and $400 to Dr. Michael C. Hilton. *Page 13 
This the __ day of August, 2007.
S/________________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/________________________ DIANNE C. SELLERS COMMISSIONER *Page 1